1
2
3
4
5
6                   UNITED STATES DISTRICT COURT
7                  NORTHERN DISTRICT OF CALIFORNIA
8
9    UNITED STATES OF AMERICA,
10            Plaintiff and Respondent,              No. CR 94-0276 PJH/
                                                        C 09-2243 PJH
11
12                  v.                              **ORDER DENYING MOTION
                                                    TO VACATE SENTENCE**
13   CONNIE C. ARMSTRONG,
14            Defendant and Movant.
15   _____/
16
17        Before the court is petitioner Connie Armstrong's motion to vacate his sentence
     under 28 U.S.C. § 2255.
18
                                    **BACKGROUND**
19
20        On February 26, 1997, after a nearly three-month trial, the jury convicted Armstrong
     on each count of a twenty-one count indictment charging him with inducing others to travel
21
     in interstate commerce as a part of a scheme to defraud in violation of 18 U.S.C. § 2314
22
     (counts 1-3), wire fraud in violation of 18 U.S.C. § 1343 (counts 4-14 and 19-21), and
23
     interstate transportation of securities traceable to fraudulently obtained funds in violation of
24
     18 U.S.C. § 2314 (counts 15-18).
25
          **A.    Factual Background**
26
          The charges stemmed from Armstrong's operation of Hamilton Taft & Company, Inc.
27
     ("Hamilton Taft"), a payroll tax service company headquartered in San Francisco,
28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  California.  Hamilton Taft was founded in 1979, and had been in business for nearly ten

2  years when Armstrong acquired it in March 1989.  It assisted large companies by

3  calculating, collecting, and paying their payroll taxes to federal, state, and local taxing

4  entities.  Hamilton Taft derived its income from the investment of funds that its clients

5  entrusted to it.  Specifically, its clients provided Hamilton Taft with funds representing tax

6  payments its clients owed to taxing authorities, and Hamilton Taft then invested the funds

7  from the time it received them until the time the checks Hamilton Taft issued to the taxing

8  agencies cleared.  At the height of its business around 1990, the company processed

9  annually $3-4 billion in payroll taxes.

10     Prior to acquiring Hamilton Taft in 1989, Armstrong was a shareholder in Hamilton

11  Taft.  He brought a shareholder's derivative lawsuit against the prior owner of Hamilton

12  Taft, another company, Maxpharma.  Armstrong alleged that Maxpharma had looted

13  Hamilton Taft by loaning $14 million in client funds to Maxpharma's affiliated companies.

14  Instead of putting Hamilton Taft in bankruptcy, Maxpharma settled the lawsuit with

15  Armstong on March 29, 1989, and one provision of the settlement provided that

16  Maxpharma "give" Hamilton Taft to Armstrong.  At the time Armstrong acquired the

17  company, Hamilton Taft was operating with a $14 million shortfall.

18     Following his acquisition of Hamilton Taft, Armstrong appointed codefendant Richard

19  Fowles as its president, and Jim Paille as its corporate controller.  Paille testified at trial that

20  at Armstrong's direction, he and Fowles withheld $25 million in client tax payments, much

21  of which was transferred to Armstrong's other companies, also known collectively as

22  "Dresdner."[1]  After subsequently learning that Armstrong intended to use the client funds for

23  his personal purchase of a cattle ranch, Paille left Hamilton Taft.

24     In addition to Paille, several other Hamilton Taft insiders accused Armstrong of

25  misconduct, including Hamilton Taft's vice president of operations under Armstrong, who

26  testified that Armstrong directed him to make false representations to the Internal Revenue

27  _____

28     [1]Armstrong founded Dresdner in 1986 as an acquisition company that bought
undervalued properties.

1  Service ("IRS"); a systems manager at Hamilton Taft, whom Armstrong directed to transfer

2  Hamilton Taft funds to Armstrong's Texas companies; a sales manager and sales

3  representatives at Hamilton Taft; and even Armstrong's former fiancé, a former vice

4  president at Hamilton Taft.

5  The former Hamilton Taft employees described how Hamilton Taft attracted new

6  clients with promises that it would invest their funds in safe, short-term investments and pay

7  their taxes when they were due.  They also described how during Armstrong's tenure at

8  Hamilton Taft, Dresdner moved to lavish offices and the payroll and salaries at Dresdner

9  expanded, as did Armstrong's other personal investments, wardrobe, parties, and

10  vacations.

11  By the end of 1990, Dresdner owed Hamilton Taft $68 million, and Hamilton Taft

12  itself experienced a $17.5 million loss for the year.  Additionally, a new tax law scheduled to

13  go into effect in 1991 was going to result in rapidly escalating penalties on Hamilton Taft's

14  clients' late payments.  In January 1991, the president and controller of Dresdner quit when

15  it became apparent that disaster was looming for Hamilton Taft.

16  In March 1991, Hamilton Taft's controller, Steve Solodoff, held a meeting with

17  Hamilton Taft clients and advised them that Armstrong had embezzled $100 million in client

18  funds from the company and was running a Ponzi scheme.  Armstrong subsequently sent a

19  letter to all of the company's clients denying the allegations.  However, within days of

20  Solodoff's meeting with the clients, there was a "run on the bank," Federal Express sued

21  Hamilton Taft in federal district court, and several of its creditors, including Federal Express

22  and Stanford University, forced Hamilton Taft into involuntary bankruptcy.

23  Following the filing of the involuntary bankruptcy petition, bankruptcy trustee, Fred

24  Wyle, was appointed to oversee and investigate Hamilton Taft's finances.  Soon after his

25  appointment, Wyle discovered that although Hamilton Taft had collected $91 million from its

26  clients to pay to various taxing authorities, the company had only $5.8 million on hand.

27  Wyle's investigation revealed that over a two-year period, Hamilton Taft had been

28  preparing tax payment checks but then "holding" the checks and failing to make timely

United States District Court
For the Northern District of California

3

United States District Court

For the Northern District of California

payments to taxing authorities.  The scheme spiraled, and each quarter, more and more checks had to be "held" by Hamilton Taft in order to cover the shortfall and pay penalties incurred when taxes were not timely paid.  By late 1990, Hamilton Taft had withheld $57 million in checks already due to taxing authorities.  Wyle determined that the company was then operating as a Ponzi scheme, and that incoming funds from some clients were being utilized to pay delinquent taxes and penalties for other clients.

Wyle further learned that although Hamilton Taft was experiencing a shortfall in its accounts at the time that Armstrong took over the company in 1989, the shortfall grew during Armstrong's ownership, primarily because Armstrong caused client funds from Hamilton Taft to be transferred to Dresdner.   Wyle confirmed that Armstrong then used the funds transferred to Dresdner to purchase real estate, oil wells, a multi-million dollar ranch, a helicopter, luxury cars, the lease of an airplane, football stadium seats, and even strippers.

As a result of the fraudulent transfers, Hamilton Taft clients lost a total of more than $85 million, including $30.4 million by Federal Express and $10.4 million by Scott Paper. Of this $85 million, Wyle determined that more than $16.5 million was spent by or on behalf of Armstrong personally.

At trial, Armstrong's defense was that there was no scheme to defraud and that he had no intent to defraud anyone.  He claimed that he sought to "collateralize" Hamilton Taft's already-existing deficit and then eventually replenish the deficit through a return on other investments.  He attested that he believed that he could turn around the profitability of Hamilton Taft in part by causing Dresdner to buy other undervalued assets using funds transferred to Dresdner from Hamilton Taft.  Additionally, rather than putting Hamilton Taft in bankruptcy, Armstrong decided to "hold back" clients' checks from the IRS while he attempted to fill the deficit.

### B.    Procedural Background

Following his conviction by jury on all counts, on August 29, 1997, Judge Legge sentenced Armstrong to 108 months in custody, three years supervised release, a fine, and

**United States District Court**
For the Northern District of California

restitution in the amount of $62,750,000.

Armstrong appealed to the Ninth Circuit.  *See* Case No. 97-10392.  He argued that: (1) the district court erred by not providing his proposed theory-of-the-defense instruction; (2) that the evidence at trial was insufficient to prove the scheme and intent to defraud with respect to all 21 counts; (3) that the government failed to prove that the funds transported in interstate commerce were traceable to funds taken by fraud with respect to counts 15-18; (4) that the district court erred in refusing to admit a declaration from an accountant who advised Armstrong on various business matters; and (5) that the district court erred by communicating ex parte with the jury during deliberations.

On April 19, 2000, the Ninth Circuit affirmed in part and reversed in part.  It denied relief on all of the above claims except for the third one.  The Ninth Circuit reversed Armstrong's conviction on the interstate transportation of securities charges (counts 15-18), concluding that the government failed to present sufficient evidence to establish beyond a reasonable doubt that the transported checks were derived from fraudulently obtained funds.  The court, however, affirmed his conviction on the other eighteen counts, and remanded to the district court for resentencing.

On August 15, 2000, Judge Legge resentenced Armstrong to 108 months in prison on the eighteen counts for which his conviction had been affirmed.  Armstrong appealed, contending that the district court miscalculated the amount of loss upon which it based a seventeen-level upward adjustment, and also that the trial court violated *Apprendi v. New Jersey* by failing to submit the loss amount to the jury.  530 U.S. 466, 490 (2000).  On April 15, 2002, the Ninth Circuit affirmed.  *See* Case No. 00-10399.

Armstrong subsequently filed a petition for rehearing on May 29, 2002, which the court denied January 31, 2003.  Mandate issued February 10, 2003.

More than four years later, on June 7, 2007, Armstrong's counsel, Bill Boyd, sent the Ninth Circuit a letter advising the court that Armstrong had not received any notice from the court as to whether it had ruled on an April 26, 2002 motion for enlargement of time to file his petition for rehearing and/or whether it had ruled on his May 29, 2002 petition for

rehearing.  The Ninth Circuit subsequently sent Boyd a copy of the January 31, 2003 order denying Armstrong's petition for rehearing.

On August 2, 2007, Boyd again sent a letter to the Ninth Circuit asserting that Armstrong was not provided with the order previously or the notice required pursuant to Federal Rule of Appellate Procedure 36.  As a result of the lack of notice, Armstrong claimed that he had failed to timely file a petition for writ of certiorari with the United States Supreme Court, nor had he timely filed a petition for relief under 28 U.S.C. § 2255.

On April 22, 2008, the Ninth Circuit construed the letter as a motion to recall the mandate, which it granted.  It recalled the mandate and withdrew the January 31, 2003 order.  The court then denied the petition for rehearing, and mandate issued that same day, April 22, 2008.

On May 11, 2009, Armstrong filed a motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255.  At the time he filed his motion to vacate, Armstrong was on supervised release, serving the sentence imposed by Judge Legge.[2]

Armstrong's § 2255 motion itself has a somewhat lengthy history before this court. In a May 21, 2009 order to show cause, the court noted that Armstrong's § 2255 petition, although filed by counsel, was "not entirely comprehensible."  It appeared to the court that Armstrong raised two claims: (1) that his due process and fair trial rights were violated by alleged prosecutorial misconduct caused by undue political influence; and (2) that his due process and fair trial rights were violated by the trial court's failure to properly instruct the jury.  However, in its July 24, 2009 opposition, the government noted that Armstrong's petition actually appeared to raise three issues: (1) that his due process rights were violated because the government prosecuted him only because it was unduly pressured to do so; (2) that the government failed to disclose certain audiotapes; and (3) that the trial court erred by denying a defense request for a theory of the case jury instruction that certain assets were not held in trust for Armstrong's clients but instead were assets of

---

[2]This case was reassigned to the undersigned judge on June 29, 2001 following Judge Legge's retirement from the court.

United States District Court
For the Northern District of California

Armstrong's company that were available for his investment and use.

On August 14, 2009, Armstrong filed a motion for discovery, which the government opposed.  However, on September 10, 2009, the court stayed the case and suspended any deadlines until October 26, 2009, so that Armstrong could find new counsel following the death of his attorney, Bill Boyd.  At the time the court stayed the case, Armstrong's reply to his discovery motion was due September 18, 2009.  Additionally, the court had also ordered that Armstrong's reply to his § 2255 petition would be due thirty days after the court ruled on his motion for discovery.  Those deadlines were stayed by the order.

Subsequently, on October 26, 2009, Armstrong filed a number of documents including a notice of appearance pro se and a pro se reply in support of his motion for discovery.  The latter filing completed the briefing on the motion for discovery.

Thereafter, in a January 8, 2010 order, the court noted that based on its review of the briefs filed to date, it appeared that Armstrong's § 2255 motion was untimely.  The government had briefed the issue in its July 24, 2009 opposition, but noted that it needed additional documents in order to fully address the timeliness issue.  *See* Oppos. at 7 & n. 3.  The court stated that it preferred to resolve the timeliness issue prior to reaching the merits and/or Armstrong's discovery requests, and ordered the parties to file supplemental briefs addressing the timeliness of the petition.

In subsequent briefing, however, the government conceded that Armstrong's motion was timely based on the Ninth Circuit's April 22, 2008 order recalling its prior mandate, and its subsequent reissuance of a mandate that day.

In an April 28, 2010 order, based on the supplemental briefs and the court's review of the Ninth Circuit's docket and order, the court agreed that the petition was timely.  In that same order, the court denied Armstrong's motion for discovery, noting that two of his claims, those claims on which he sought discovery, appeared to have been procedurally

7

defaulted because Armstrong had not raised those claims on direct appeal.[3]  Accordingly, because the claims appeared to have been procedurally defaulted, the court concluded that Armstrong was unable to demonstrate good cause entitling him to discovery under Rule 6(a) of the Rules Governing Section 2255 Proceedings.

The court noted that there was only one claim that had not been procedurally defaulted:  Armstrong's claim that the trial court erred by denying a defense request for a theory of the case jury instruction that certain assets were not held in trust for Armstrong's clients but instead were assets of Armstrong's company that were available for his investment and use.  The court noted that this issue had been raised before and rejected by the Ninth Circuit on appeal.

The court then ordered Armstrong to file his reply to his § 2255 motion by May 28, 2010.  Armstrong thereafter filed his reply on June 1, 2010.[4]

Subsequently, Armstrong successfully completed his term of supervised release on January 2, 2011.  On June 30, 2011, the court inquired whether Armstrong's release had mooted his § 2255 petition.  By written order, the court noted that "[g]iven the fact that Armstrong filed the § 2255 motion while he was still on supervised release and 'in custody,' his subsequent completion of supervised release" clearly did "not deprive the court of jurisdiction."  *See Tyars v. Finner*, 709 F.2d 1274, 1279 (9th Cir. 1983).  Nevertheless, the court asked the parties to consider whether completion of his sentence mooted the relief sought by Armstrong.

Both Armstrong and the government responded.  Armstrong argued that his § 2255 petition was not moot because he continues to suffer collateral consequences from the conviction, including the deprivation of the right to vote, hold office, serve on a jury, the fact

---

[3] Those included Armstrong's claims: (1) that his due process rights were violated because the government prosecuted him only because it was unduly pressured to do so; and (2) that the government failed to disclose certain audiotapes.

[4] Armstrong contends that the documents were actually received by the court via Federal Express on the morning of May 28, 2010, in spite of the fact that they were not e-filed until June 1, 2010.  The court need not resolve any dispute over the precise filing date, though, because it has reviewed and considered the reply.

United States District Court
For the Northern District of California

that his conviction could be used to impeach testimony he gives in future proceedings, and the possibility that his conviction could impact future criminal proceedings and result in the possibility of harsher punishment in conjunction with other convictions.

The government agreed that the "presumption" of such collateral consequences, combined with the fact that Armstrong's § 2255 motion challenges his conviction as well as his sentence, meant that his § 2255 motion was not mooted by the fact that his sentence is now complete.

In a July 22, 2011 order, the court ruled that it would not dismiss Armstrong's petition as moot as a result of his release from prison. In that same order, the court also noted that two preliminary issues remained before the court could address the merits of Armstrong's § 2255 motion. As for Armstrong's first two claims,[5] which were not raised on direct appeal, the court noted that Armstrong suggested that he was able to demonstrate cause and prejudice for their procedural default. The court noted that in order to do so, Armstrong still needed to demonstrate sufficient cause and prejudice allowing this court to reach them in spite of his procedural default. *See Bousley v. United States*, 523 U.S. 614, 621 (prisoner who failed to challenge validity of guilty plea on appeal procedurally defaulted claim); *United States v. Skurdal*, 341 F.3d 921, 925 (9th Cir. 2003) (prisoner who failed to bring claims of error on direct appeal procedurally defaulted them); *United States v. Mejia-Mesa*, 153 F.3d 925, 928 (9th Cir. 1998) (same); *see also United States v. Schlesinger*, 49 F.3d 483, 485 (9th Cir. 1995) (non-constitutional sentencing errors that were not raised on direct appeal considered waived and may not be reviewed by way of § 2255 motion).

As for Armstrong's third claim,[6] the court noted that even though it had not been procedurally defaulted because it was raised on appeal, there was nevertheless an

---

[5]The court noted that those claims appeared to be that: (1) his due process rights were violated because the government prosecuted him only because it was unduly pressured to do so; and (2) the government failed to disclose certain audiotapes.

[6]The court noted that claim appeared to be that the trial court erred by denying a defense request for a theory of the case jury instruction that certain assets were not held in trust for Armstrong's clients but instead were assets of Armstrong's company that were available for his investment and use.

United States District Court

For the Northern District of California

1    additional bar to this court's review of that claim, which the government briefly mentioned in

2    its opposition, but that Armstrong had failed to adequately address.  The court ordered that

3    Armstrong still needed to show that exceptional circumstances existed permitting the court

4    to review the claim since the general rule is that claims presented and rejected on direct

5    appeal may not be litigated again in a § 2255 motion.  *See United States v. Scrivner*, 189

6    F.3d 825, 828 (9th Cir. 1999) (appellate court decision rejecting claim was binding on court

7    considering § 2255 motion)*; Davis v. United States,* 417 U.S. 333, 342 (1974).

8         In addition to the two preliminary issues, the court also noted that there were

9    numerous evidentiary problems and issues with the exhibits which prevented the court from

10   utilizing the exhibits both in evaluating the remaining preliminary issues and with respect to

11   the merits.  Additionally, the court noted that the parties' briefs were inadequate in their

12   briefing of the issues on the merits, and that Armstrong had not appropriately clarified the

13   claims that he was raising.

14        Accordingly, the court ordered Armstrong to re-submit and/or bring the evidence on

15   which he intended to rely in conformance with the Federal Rules of Evidence.  Additionally,

16   the court ordered the parties to brief and/or rebrief the remaining procedural issues and the

17   merits of Armstrong's claims.  With respect to each of the three claims, the court required

18   Armstrong to: (1) succinctly set forth his claim; (2) set forth his procedural arguments

19   regarding why he should be permitted to bring the claim before this court and/or why the

20   court should consider the claim on the merits; and (3) after addressing the procedural

21   issue, set forth his arguments regarding the merits of the claim.

22        Subsequently, on September 27, 2011, the parties completed the rebriefing required

23   by the July 22, 2011 order.  At the outset, the court notes that the recent briefs are better

24   organized and clearer than the prior briefs.  Additionally, Armstrong clarified the nature of

25   his claims, re-submitted the evidence in support of his motion in compliance with the

26   Federal Rules of Evidence, and has also provided declarations and adequate information to

27   properly authenticate and identify the evidence.

28

**DISCUSSION**

**A.      Armstrong's "New" Evidence**

The evidence in support of his motion before this court consists primarily of documents that Armstrong received in 2004 in response to a FOIA request that he filed while in prison.  It includes several letters written by FBI agents and internal FBI memos and reports detailing the FBI's investigation of Hamilton Taft and of Armstrong, dating from September 23, 1988, through February 8, 1993.  *See* Armstrong August 19, 2011 Decl. ("1st Armstrong Decl."), Exhs. A, B, D, H, K, N, O, P, Q; Armstrong Sept. 27, 2011 Decl. ("2nd Armstrong Decl."), Exhs. R, U, V.

Armstrong has also provided documents from and pertaining to Hamilton Taft's involuntary bankruptcy case (Exhs. E, U, V); an October 29, 1981 opinion letter prepared for Hamilton Taft by the law firm of Baker & McKenzie, drafted prior to Armstrong's acquisition of the company (Exh. C); the March 13, 1991 complaint in the civil fraud lawsuit Federal Express brought against Hamilton Taft (Exh. F); and a March 15, 1991 article from the Wall Street Journal discussing Armstrong's wrongdoing at Hamilton Taft (Exh. G).

Additionally, Armstrong also submitted several hearing transcripts and documents filed with Judge Legge in conjunction with the criminal case.  *See* 1st Armstrong Decl., Exhs. I, J, L, M; 2nd Armstrong Decl., Exhs. S, T.

In addition to the facts already set forth above, Armstrong's exhibits suggest that an inside source at Hamilton Taft began talking to FBI agents regarding the company's preparation of false and misleading financial statements as early as August 1988, prior to Armstrong's acquisition of the company.  *See* 1st Armstrong Decl., Exh. A.  That source apparently left Hamilton Taft in approximately 1985 due to personality conflicts between himself and an executive at Hamilton's Taft's then-owner, Cigna.  In or around September 23, 1988, the FBI presented the details of its interview with the source to Assistant United States Attorney Mike Yamaguchi, who determined that "there was insufficient evidence to support a violation of federal law at [that] time and he would therefore decline prosecution." *Id.*  However, "if further information could be obtained regarding the allegations presented,"

**United States District Court**

For the Northern District of California

1 AUSA Yamaguchi stated that he "would reconsider his opinion."  *Id.*

2        Following Armstrong's acquisition of Hamilton Taft in 1989, in December 1990, the

3 FBI received another complaint from then-Hamilton Taft controller, Steve Solodoff, that

4 Hamilton Taft was cheating the IRS and other taxing entities.[7]  1st Armstrong Decl., Exh. B.

5 Solodoff advised the FBI that at least $20 million in client funds had recently been

6 transferred to accounts controlled by Armstrong, who at that time was the new CEO of

7 Hamilton Taft.  *Id.*  He asserted that Armstrong was running a Ponzi scheme, utilizing tens

8 of millions of dollars sent to Hamilton Taft by its clients.  *Id.*

9        FBI agents appear to have talked with Solodoff several times, including in February

10 and early March 1991.  1st Armstrong Decl., Exh. D.  Around this same time, the matter

11 was again referred to AUSA Yamaguchi for possible prosecution.  *Id.*  The government,

12 however, was concerned about undertaking an overt investigation based on information

13 learned from the source for fear that it would later be blamed for initiating the downfall of

14 Hamilton Taft, and apparently had been unable to thoroughly corroborate all of the

15 information provided by the source.  *Id.*  Solodoff was himself concerned, though, about the

16 amount of time that it was taking the FBI to initiate an official investigation and subsequent

17 criminal proceedings.  *Id.*  Apparently, the FBI agent advised him that it needed a "victim."

18 *Id.*  During that interview, Solodoff admitted to the agent that he had contacted United

19 States Representative Nancy Pelosi's and United States Senator Barbara Boxer's offices

20 regarding the events at Hamilton Taft and that he had been given the name of an

21 investigative reporter.  *Id.*

22        Presumably, Solodoff was given the name of San Francisco investigative reporter

23 Ralph T. King, Jr., with the Wall Street Journal, *See* 1st Armstrong Decl., Exh. G.  The

24 reporter then contacted an IRS agent to confirm that the IRS was conducting an

25 investigation of Hamilton Taft.  1st Armstrong Decl., Exh. D.

26        On March 6, 1991, an FBI agent spoke with the Wall Street Journal reporter and

27

28          [7]Solodoff is not named in the FBI documents; however, his identity is apparent based on a March 15, 1991 Wall Street Journal article discussed below.

1   stated that he could neither confirm nor deny the existence of an investigation into Hamilton

2   Taft. *Id.* That same day, March 6, 1991, a Sun Microsystems security officer called the FBI

3   agent and advised him that Sun had been contacted by a Hamilton Taft insider, Solodoff,

4   who advised Sun that it may have been the victim of fraud perpetrated by Hamilton Taft.

5   *Id.* Sun advised the FBI agent that it was participating in a meeting with other potential

6   Hamilton Taft victims, and subsequently sent the FBI Sun's documentation supporting the

7   insider's allegations regarding the fraud at Hamilton Taft. *Id.* The meeting with other

8   Hamilton Taft clients took place at Sun's offices on March 8, 1991. *Id.*

9       Soon thereafter, on March 15, 1991, the Wall Street Journal ran a front-page article

10  detailing the alleged wrongdoing by Armstrong and Hamilton Taft, entitled: "Was the Big

11  Spender Just Spending Money Firms Owed to IRS?: Texan 'Chip' Armstrong Ran Scheme

12  Processing Funds, Former Employee Alleges."  1st Armstrong Decl., Exh. G.  The

13  newspaper article described Armstrong's background and a recent Fourth of July

14  "extravaganza" that Armstrong threw at his 3000-acre Texas ranch to celebrate

15  Armstrong's father's release from prison following a conviction for laundering drug money.

16  The article detailed Armstrong's more humble beginnings, including the fact that he had

17  previously worked as a fireman and had personally filed for bankruptcy.  It described

18  Armstrong and his apparent newfound wealth as a "mystery."

19      However, the article then suggested that an explanation for Armstrong's relatively

20  newfound wealth had emerged, and noted that former Hamilton Taft controller, Solodoff,

21  had in the days before the article was published advised a number of large private

22  companies and institutions that Armstrong had diverted nearly $100 million in client funds

23  from the proper governmental agencies for his personal use.  The article further noted that

24  some Hamilton Taft customers had confirmed the alleged diversions.

25      The article noted that Solodoff submitted filings in support of Federal Express' civil

26  lawsuit, the substance of which the article detailed and relied on to describe Armstrong's

27  alleged scheme.  It stated that "[a]cting on Solodoff's tip, customers representing half of

28  Hamilton Taft's deposits ha[d] suspended payments and demanded proof from the

United States District Court
For the Northern District of California

1  company that it made complete and timely deposits." The article quoted Federal Express'

2  attorney and the attorney of another Hamilton Taft customer. Additionally, one of Hamilton

3  Taft's accountants from KPMG Peat Marwick told the reporter that it had been unable to

4  complete full audits of Hamilton Taft's books for the prior two years because the company

5  failed to provide it with the necessary data. Armstrong advised the newspaper that he

6  wanted to tell his side of the story, but that he wasn't talking on the advice of his attorney.

7       Several weeks after the Wall Street Journal article was published, on April 3, 1991,

8  the FBI officially announced its investigation of Armstrong and Hamilton Taft. 1st

9  Amrstrong Decl., Exh. H.

10      On January 13, 1992, an FBI agent appears to have attended a conference at the

11  offices of Hamilton Taft bankruptcy trustee, Fred Wyle's attorneys. 1st Armstrong Decl.,

12  Exh. O. Wyle, his attorneys, and his accountant were present. The conference attendees

13  discussed in large part Armstrong's alleged financial misdealings, including the fact that a

14  preliminary report prepared in conjunction with the bankruptcy proceedings revealed that

15  approximately $4 million in Hamilton Taft funds had been traced as going directly to

16  Armstrong. Among other things, Armstrong's extravagant standard of living was discussed,

17  and one of the conference attendees noted that in March and April 1991 alone, Armstrong

18  had liquidated a helicopter in his own name, had paid $700,000 to a Dallas criminal lawyer

19  on his own behalf, and had made a $300,000 payment that likely went to a San Francisco

20  law firm on his own behalf as well. Additionally, it was noted that Armstrong had spent

21  $265,000 of Hamilton Taft funds on Dallas Cowboys stadium seats. The trustee's law firm

22  noted that it had recently filed a motion for contempt against Armstrong in the bankruptcy

23  case based on his alleged violation of a temporary restraining order.

24      Subsequently, on March 5, 1992, AUSA Michael Yamaguchi, the bankruptcy

25  trustee's attorney, FBI agents, and the California Deputy Attorney General of the Major

26  Fraud unit met to discuss the prosecution strategy as it pertained to Armstrong. 1st

27  Armstrong Decl. Exh. Q. An FBI report memorializing the meeting noted that "[t]he next

28  investigative step [wa]s to apply for an ex parte order for Armstrong's personal tax returns

14

1  for 1988, 1989, and 1990," and that "several interviews of former Amrstrong associates

2  [would] be conducted in Texas." *Id.*

3       Armstrong was subsequently indicted in the criminal case on June 27, 1994.

4  **B.    Armstrong's Claims**

5       With respect to each of the three claims, the court has organized each claim in

6  accordance with it July 2011 order requiring Armstrong to: (1) succinctly set forth his claim;

7  (2) set forth his procedural arguments regarding why he should be permitted to bring the

8  claim before this court and/or why the court should consider the claim on the merits; and (3)

9  after addressing the procedural issues, set forth his arguments regarding the merits of the

10 claim, and requiring the government to respond.

11      **1.    *Brady* Claim**

12           **a.    Succinct Statement of Claim**

13      Armstrong contends that the government's failure to disclose its prior investigation of

14 him and the fact that that investigation "was declined for lack of evidence," coupled with the

15 outside pressure to indict him, constituted a *Brady* violation.  *Brady v. Maryland*, 373 U.S.

16 83, 87 (1963).  He contends that this claim is based in large part on evidence disclosed

17 pursuant to a post-appeal FOIA request.  Armstrong characterizes the information as

18 exculpatory and argues that the evidence establishes the government's initial reluctance to

19 commence prosecution or open a new investigation.

20           **b.    Procedural Bar**

21      Armstrong did not raise this issue on appeal, and thus as noted by the court's prior

22 order, he is required to demonstrate sufficient cause and prejudice allowing this court to

23 reach it in spite of his procedural default.  *See Bousley*, 523 U.S. at 621.

24      Armstrong argues that he has established cause because the government failed to

25 disclose evidence of the prior "exculpatory" investigation until his FOIA request, years after

26 his direct appeal deadline had passed.  He contends that this failure actually amounted to

27 the concealment of *Brady* material until after the running of his direct appeal deadlines, and

28 that cause is shown where the factual or legal basis of a claim was not reasonably

United States District Court

For the Northern District of California

1    available at the time of the direct appeal.  *United States v. Braswell*, 501 F.3d 1147, 1150

2    (9th Cir. 2007).

3         The government does not dispute that Armstrong has demonstrated cause for

4    default based on the fact that Amrstrong learned the information in conjunction with the

5    FOIA request following his direct appeal.  Both parties agree that the prejudice prong is

6    intertwined with the merits, which the court discusses below.

7              **c.    Merits**

8         Armstrong contends that a *Brady* violation occurred when the government failed to

9    disclose the fact of the prior investigation, including AUSA Yamaguchi's "exculpatory

10   conclusion" and the "high level of political involvement at the onset of the 1991 inquiry,"

11   including "interplay between a disgruntled former Hamilton Taft employee, the IRS, the

12   staffs of Senator Barbara Boxer and Representative Nancy Pelosi, the Wall Street Journal,

13   and the FBI."  Armstrong suggests that the evidence is material because the jury would

14   have been advised that a prior investigation had been terminated, and argues that would

15   have given the jury reason to question the subsequent investigation that led to Armstrong's

16   conviction.

17        The government counters that the prosecutor's September 1988 conclusion that, at

18   that time, there was insufficient evidence to support a criminal prosecution is not

19   exculpatory evidence under *Brady* given that the prior conclusion was superseded after the

20   FBI developed new evidence.  As for the alleged political pressure, the government notes

21   that political pressure generally is *not* an impermissible basis for bringing charges so long

22   as the prosecutor has probable cause that the defendant committed a crime, which it did in

23   this case.  Additionally, the government argues that Armstrong has not actually shown that

24   it was political pressure that led to the subsequent decision to prosecute.   Finally, even if

25   the court could construe Armstrong's exhibits as establishing political pressure to

26   prosecute, the government asserts that such evidence is not exculpatory.

27        Because there is no merit to Armstrong's claim, the government argues that he has

28   failed to demonstrate prejudice to overcome the procedural bar, and thus that the claim

United States District Court

For the Northern District of California

16

1    fails both procedurally and on the merits.

2        In reply, Armstrong asserts that the 1988 criminal investigation was "closed," as

3    opposed to being "placed on the back burner."  He suggests that it was only reopened after

4    a whistleblower came forward, and then further advanced following an article in the Wall

5    Street Journal.  He argues that the evidence associated with the prior investigation must

6    have been exculpatory because "[i]n matters relating to financial fraud there will be only

7    limited middle ground between inculpatory and exculpatory evidence."  He contends that

8    the court should find a *Brady* violation because the government withheld all of the evidence

9    of the prior investigation.

10                    **d.    Analysis**

11       At the outset, and in spite of the fact that the government has conceded *all* of the

12   procedural default issues in connection with this motion, the court notes that it does not

13   agree that all of the information obtained by Armstrong in conjunction with his FOIA request

14   is "new," thus providing cause for any procedural default.  It is true that *some* of the FOIA

15   information was potentially "new" to Armstrong, including the fact of the prior investigation

16   and the AUSA's determination regarding that investigation.  However, the public Wall Street

17   Journal article cannot be considered "new;" nor may the information contained therein be

18   considered "new" - even if it was contained in other sources that were previously

19   undisclosed to Armstrong.

20       At a minimum, the information previously available to Armstrong included the

21   allegations regarding Armstrong's alleged fraud made by former Hamilton Taft controller,

22   Steven Solodoff, the fact that Solodoff was speaking with federal authorities, the fact that

23   Solodoff had spoken with Hamilton Taft clients, and information filed in Federal Express'

24   civil lawsuit.  In sum, at best, the "new" and previously undisclosed evidence included the

25   fact of the prior 1988 investigation and the fact that Solodoff contacted Representative

26   Pelosi's and Senator Boxer's offices and received the name of an investigative reporter.

27   Thus, to the extent Armstrong has established cause for the procedural default, it is based

28   only on that evidence which is indeed "new."

17

1       For the reasons set forth below, the court concludes that Armstrong is not entitled to

2   relief on this claim because the "new" evidence was not material under *Brady.*

3       The suppression by the prosecution of evidence favorable to an accused upon

4   request violates due process where the evidence is material either to guilt or to

5   punishment, irrespective of the good faith or bad faith of the prosecution.  *Brady*, 373 U.S.

6   at 87.  A *Brady* claim has three components: "[t]he evidence must be favorable to the

7   accused, either because it is exculpatory, or because it is impeaching; that evidence must

8   have been suppressed by the state, either wilfully or inadvertently; and prejudice must have

9   ensued."  *Strickler v. Green*, 527 U.S. 263, 281-282 (1999); *see Banks v. Dretke*, 540 U.S.

10  668, 691 (2004).  Once constitutional error has been found under *Brady,* it cannot

11  subsequently be found harmless; the conviction must be set aside.  *See Kyles v. Whitley*,

12  514 U.S. 419, 436 (1995).

13      For the first component of the claim, evidence is exculpatory if it is "merely favorable

14  to the accused."  *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004).  The evidence does not

15  have to affirmatively prove the defendant innocent; but must instead satisfy the "low,

16  favorable to the accused standard."  *Id.*  Both exculpatory and impeachment evidence may

17  be favorable to the accused under the *Brady* standard.  *United States v. Bagley*, 473 U.S.

18  667, 676 (1985); *Benn v. Lambert*, 283 F.3d 1040, 1052 (9th Cir. 2002).  In addition,

19  exculpatory evidence includes evidence whose value allows a defendant to attack the

20  thoroughness and good faith of an investigation, albeit typically in cases where the

21  suppressed evidence is needed to impeach a government witness. *See Kyles*, 514 U.S. at

22  445; *see, e.g., Bagley*, 473 U.S. at 676-677 (government suppressed evidence that witness

23  received a promise that he would not be prosecuted in exchange for testimony); *Benn*, 283

24  F.3d at 1053 (state suppressed impeachment evidence of prosecution witness); *Paradis v.

25  Arave*, 240 F.3d 1169, 1175 (9th Cir. 2001) (state suppressed inadmissible handwritten

26  notes that could be used to impeach expert opinion).

27      The "new" evidence regarding the prior 1988 investigation and Solodoff's alleged

28  political contacts is not exculpatory.  It does nothing to undermine the good faith of the

18

subsequent investigation that led to Armstrong's indictment, and in fact actually suggests

good faith on the prosecution's behalf in so far as it declined to initiate proceedings until it

had sufficient evidence and cause to do so.  Additionally, the "new" evidence also fails to

demonstrate a political conspiracy to indict Armstrong.  Rather, at best, it shows that

Solodoff, Hamilton Taft's former controller, was intent on exposing Armstrong's misconduct,

and notified Representative Pelosi's and Senator Boxer's offices in his efforts to bring the

scheme to light.  In doing so, Solodoff was put in touch with an investigative reporter.

However, even if by some stretch the "new" evidence could be deemed to qualify as

favorable impeachment evidence, and thus exculpatory evidence for *Brady* purposes, the

court concludes that it was not material for the reasons set forth below.

Regarding the second component, the government has no good faith or

inadvertence defense to a *Brady* claim; whether nondisclosure was negligent or by design,

it is the responsibility of the prosecutor.  *Gantt*, 389 F.3d at 912.  There is no dispute here

that the government failed to disclose the "new" evidence discussed above.

Turning to the third component, the terms "material" and "prejudicial" are used

interchangeably to describe it.  *Bailey v. Rae*, 339 F.3d 1107, 1116 n. 6 (9th Cir. 2003);

*see also Benn*, 283 F.3d at 1053 n. 9 ("Evidence is not 'material' unless it is 'prejudicial,'

and not 'prejudicial' unless it is 'material'").  "Prejudice" and "materiality" are

interchangeable because the *Brady* standard for materiality is the same as the standard for

determining prejudice in ineffective assistance of counsel claims.  *See Kyles*, 514 U.S. at

434 (court adopted "reasonably probability" standard for *Brady* claims from *Strickland v.*

*Washington*, 466 U.S. 668, 694 (1984)); *Bagley*, 473 U.S. at 682 (*Strickland* formulation is

sufficiently flexible to cover cases of prosecutorial failure to disclose favorable evidence);

*Strickland,* 466 U.S. at 694 (appropriate standard to determine ineffective assistance of

counsel prejudice is rooted in the test for materiality of exculpatory information not

disclosed to the defense); *see also Downs v. Hoyt*, 232 F.3d 1031, 1038 (9th Cir. 2000)

(citing *Strickland* and *Kyles* for the ineffective assistance of counsel "reasonable probability"

standard); *Benn*, 283 F.3d at 1053 (*Brady* claim evaluated using the same standard as

1    ineffective assistance of counsel claims).

2         The "touchstone of materiality is a 'reasonable probability' of a different result."

3    *Kyles*, 514 U.S. 419, 434 (1995).  This reasonable probability is "shown when the

4    government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"

5    *Id.* (quoting *Bagley*, 473 U.S. at 678).  Thus, "[a] showing of materiality does not require

6    demonstration by a preponderance that disclosure of the suppressed evidence would have

7    resulted ultimately in the defendant's acquittal," but must only establish that "the favorable

8    evidence could reasonably be taken to put the whole case in such a different light as to

9    undermine confidence in the verdict."  *Kyles*, 514 U.S. at 434-435; *see also United States*

10   *v. Golb*, 69 F.3d 1417, 1430 (9th Cir. 1995) (the ultimate question is whether there is a

11   reasonable probability that, had the evidence been disclosed, the result of the proceeding

12   would have been different such that confidence in outcome is undermined); *Bailey*, 339

13   F.3d at 1118 (suppression of "linchpin" evidence left little confidence in outcome of trial).

14   The ultimate question for materiality is thus whether "disclosure of the suppressed evidence

15   to competent counsel would have made a different result reasonably probable."  *Kyles*, 514

16   U.S. at 441.

17        Whether a "reasonable probability" exists may not be based on mere speculation

18   without adequate support.  *See Wood v. Bartholomew*, 516 U.S. 1, 6-8 (1995); *see also*

19   *Downs*, 232 F.3d at 1037 (rejecting as speculative an argument that withheld

20   material–namely, police leads, including pictures and names of suspects–might have led to

21   some admissible evidence that might have been sufficiently favorable to meet the *Brady*

22   standard).

23        A determination of materiality under the *Brady* standard requires the evidence to be

24   considered collectively.  *Kyles*, 514 U.S. at 434.  In addition, the materiality of the

25   suppressed evidence is considered with the evidence admitted at trial.  *See United States*

26   *v. Ross*, 372 F.3d 1097, 1107-1108 (9th Cir. 2004); *see also United States v. Agurs*, 427

27   U.S. 97, 112 (1976) (materiality of suppressed evidence must be evaluated in the context

28   of the entire record).  The materiality of suppressed evidence requires the court to gauge

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  the collective impact of the withheld evidence in terms of the strength of the prosecution's

2  case.  *See Barker v. Fleming*, 423 F.3d 1085, 1100 (9th Cir. 2005).   Thus, to determine

3  materiality, the exculpatory evidence must be considered with the evidence that was

4  actually considered at trial to determine whether or not the trial, in the absence of the

5  suppressed evidence, resulted in a verdict "worthy of confidence."  *Kyles*, 514 U.S. at 434.

6       The "new evidence" here cannot be considered material or prejudicial.  It does not

7  undermine the evidence of Armstrong's guilt; nor can this court conclude that the early

8  assessment in conjunction with the prior investigation could reasonably be taken to put the

9  whole case in such a different light so as to undermine confidence in the verdict.  The

10 evidence simply demonstrates that the government waited to pursue the criminal charges

11 until after it had other information corroborating the initial source's allegations, which it

12 subsequently acquired through Solodoff, during the course of the Hamilton Taft bankruptcy

13 trustee's investigations in the bankruptcy case, and from disgruntled Hamilton Taft clients.

14 None of these factors were impermissible, let alone would they have made a different

15 outcome reasonably probable.

16      For these reasons, this claim fails.

17      **2.      Audiotapes**

18      In their briefing, both parties appear to have mistakenly assumed the undersigned

19 judge presided over Armstrong's trial fourteen years ago because neither party set forth the

20 relevant background facts pertaining to the second or third claims.  The court, however, has

21 reviewed the record, including the clerk's transcripts and the reporters' transcripts, to

22 ascertain the pertinent factual background with respect to both claims two and three.

23      In October 1992, while Hamilton Taft was in bankruptcy and before the criminal

24 indictment in this case, Armstrong acquired a controlling interest in Comp-U-Check, a

25 publicly-traded Detroit, Michigan-based company that provided check guarantees and bad

26 check collection services to retailers.  Terri Robins, a prior employee of Armstrong's, came

27 to work for him at Comp-U-Check.  In the meantime, she had been retained as a paid

28 government informant by the Dallas FBI office, which was investigating Armstrong and

1    Comp-U-Check, and in that capacity, wore a wire and recorded several conversations

2    between herself and Armstrong from December 7, 1993, until March 3, 1994.

3            Apparently, on a weekend recess during the jury trial in this case, government

4    counsel learned for the first time during pre-testimony conversation and preparation that

5    Ms. Robins possessed recorded conversations of Armstrong.  On January 13, 1997, the

6    government notified Judge Legge of that fact in an ex parte filing.  That same day, Judge

7    Legge held a hearing outside the presence of the jury regarding the recordings.  1st

8    Armstrong Decl. Exh. I.  At that point, the government noted that it had not yet seen or

9    heard the recordings.  Judge Legge stated that he was concerned about potentially

10   exculpatory statements and the fact that Armstrong likely had a right to see and/or hear the

11   recordings because they constituted statements of a proffered prosecution witness, Ms.

12   Robins, and also because they were potentially *Brady* material.

13           Subsequently, at the January 13, 1997 hearing, the defense moved to exclude

14   Robins as a witness on due process grounds, which Judge Legge denied.  During the

15   course of the hearing, Assistant United States Attorney Ronald Smetana stated:

16           I think, just make a [sic] record, to my knowledge, Comp-U-Check was a
             separate investigation initiated in Dallas.  It's not something that we have
17           played a role in or had any contact with.  I need to speak only because I'm the
             one who'd been with this case the longest. [Assistant United States Attorney
18           George] Hardy is a fairly recent addition.

19           We've not been involved in [the] Comp-U-Check investigation.  I don't know
             its current status.  If it's still an open investigation, I believe it is.  Just from my
20           conversation this morning, to my knowledge they're two totally separate
             investigations.
21
     *Id.* at 2895.
22
             At the conclusion of the January 13, 1997 hearing, Judge Legge ruled that the
23
     government needed to postpone calling Ms. Robins as a witness until the statements or
24
     recordings were available and until the defense had a chance to digest Armstrong's
25
     recorded statements.
26
             In a subsequent January 27, 1997 affidavit, FBI Agent Willard Hatcher, who was at
27
     that time the case agent for Armstrong's prosecution, attested that on January 12, 1997, he
28

United States District Court
For the Northern District of California

learned about the recordings for the first time after Ms. Robins informed the government of their existence.  1st Armstrong Decl. Exh. J.   Hatcher attested that he first entered the Armstrong investigation in March 1991, and from the time he entered the case until January 1, 1997, FBI Special Agent Patrick Murphy was the responsible case agent, but that Murphy had since retired.  *Id.*  On January 13, 1997, after learning of the recorded conversations, Hatcher telephoned former Agent Murphy regarding Murphy's awareness of the recordings.  *Id.*  Murphy advised Hatcher that he was aware that Ms. Robins had recordings from an unrelated investigation, but that he did not know Ms. Robins had recordings of Armstrong.  *Id.*

Hatcher further attested that he and Agent Murphy were aware of the Dallas FBI's investigation of Armstrong's activity at Comp-U-Check.  However, to their knowledge, that investigation was unrelated to the Hamilton Taft investigation and took place after the bankruptcy of Hamilton Taft.

Hatcher stated that after learning of the Armstrong recordings, he contacted FBI Special Agent Peter Galbraith, the Dallas FBI case agent for the Comp-U-Check investigation, and requested all of the Armstrong recordings in the Dallas FBI's possession. He also requested and received all of the Dallas FBI reports related to the recordings.

Hatcher further noted that the Dallas FBI's investigation of Comp-U-Check was ongoing, and that Agent Galbraith had expressed concern regarding the disclosure of the recordings and related documents to Armstrong.  According to Galbraith, the recordings of Armstrong's conversations occurred in late 1993 and early 1994, after the Hamilton Taft bankruptcy but before Armstrong was indicted in the criminal case in this court.

Hatcher and other special agents and AUSAs reviewed the audiotapes and related documents, and determined that Hamilton Taft was mentioned in five of the audiotapes, and that one document contained statements attributed to Armstrong concerning Hamilton Taft.

A few days after the January 13, 1997 hearing, the government provided the defense with five Armstrong-Robins tapes and turned the remaining 31 tapes over to the

United States District Court

For the Northern District of California

court for an in camera inspection.  At a January 27, 1997 hearing, Judge Legge afforded the defense more time to review the tapes and documents.  That same week, the defense requested a thirty-day continuance of the trial so that it could review the tapes and determine their possible use in its case during trial.  Judge Legge denied the request, and instead opted to have a special master of the defendant's choosing appointed to review the tapes and to make a preliminary determination regarding relevance.

The defense, however, ultimately did not elect to have a special master appointed, and instead waited until the trial ended and reviewed the tapes itself.  After his conviction, Armstrong moved for a new trial based in part on the late-disclosed audiotapes, contending that the government's failure to timely disclose the tapes violated his due process rights under *Brady*.

Judge Legge denied the motion, ruling that he didn't believe that

there was any *Brady* violation here.  As soon as the government spotted the problem, it withdrew Robins as a witness and Robins did not testify.

The information was disclosed to the defense just as soon as it was learned, and [the court] offered to pay for the expense of a special master from CJA funds so that the matters could be gone over rapidly.

I also think that there's really hardly any showing here of any truly exculpatory material.  The fact of one consistent statement by Mr. Armstrong I really don't think rises to that level of being exculpatory.

8/29/97 Transcripts at 11.

### a.    Succinct Statement of Claim

Armstrong now asserts that this issue does not really concern the audiotapes, and concedes that the audiotapes are *not* compelling evidence in his favor.  Instead, he argues that this claim concerns the submission of false testimony to the court by government counsel and the submission of a false affidavit by an FBI case agent.  He contends that the false evidence was submitted in conjunction with arguments the government made in opposition to his request for the continuance of the trial following its production of the tapes to his counsel.  Armstrong thus clarifies that his claim is one based on alleged fraud on the court.

United States District Court

For the Northern District of California

1

**b.      Procedural Bar**

2        As noted, Armstrong is required to demonstrate sufficient cause and prejudice

3   allowing this court to reach this claim in spite of his procedural default.  *See Bousley*, 523

4   U.S. at 621.  The government has conceded that the primary exhibit upon which Armstrong

5   bases this claim, Exh. K, constitutes new evidence that Armstrong received in 2004 in

6   conjunction with his FOIA request and provides cause for the procedural default.  Unlike

7   the first claim, the court has no reason to disagree with the government's characterization

8   of this evidence as new.

9

**c.      Merits**

10       Specifically, Armstrong claims that AUSA Smetana and FBI Agent Hatcher lied to

11  the court when they stated that the recordings at issue were made by the Dallas FBI office

12  in connection with an unrelated investigation.

13       Armstrong contends that a document he received pursuant to his FOIA request

14  demonstrates that the statements were false.  Specifically, he points to what appears to be

15  a February 22, 1993 internal FBI memorandum to the Dallas FBI office from the San

16  Francisco FBI office that states:

17       SA Hatcher has obtained verbal authorization from United State Attorney,
         Michael Yamaguchi, for [REDACTED] confidential source to record
18       conversations with subjects of this case.

19  Exh. K.

20       He argues that the prosecutor and FBI agent perpetrated a fraud on the court, and

21  that the court should set aside the judgment for that reason.

22       In opposition, the government argues that the exhibit Armstrong relies on is unclear

23  regarding the San Francisco office's role in the recording.  It notes that it appears from the

24  communication that the Dallas FBI sought San Francisco's approval before recording

25  conversations with Armstrong, but that the communication does not show that the

26  recordings themselves concerned the Hamilton Taft prosecution.

27       However, even if the exhibit renders Hatcher's and Smetana's statements false, the

28  government argues that any falsehood did not rise to the level of fraud on the court.  It

25

contends that whether the tapes were made for the Hamilton Taft or Comp-U-Check investigation was tangential to the court's decision regarding whether to grant Armstrong a trial continuance. It asserts that the important factor in the court's denial of the continuance was the fact that the government was not offering the tapes (or Robins' testimony) in evidence. Moreover, the government also contends that fraud on the court is a civil concept, and that it cannot be used to attack a criminal conviction.

Finally, because there is no merit to Armstrong's claim, the government argues that he has failed to demonstrate prejudice to overcome the procedural bar, and thus that the claim fails both procedurally and on the merits.

In reply, Armstrong contends that the claim is based *not* on Federal Rule of Civil Procedure 60(b) but on the inherent powers of the court. He further argues that the record contradicts the government's argument that there was no fraud.

### d.    Analysis

The court was unable to locate a single Ninth Circuit criminal case entertaining a claim such as that raised here by Armstrong. The government is correct that such claims are typically brought in civil cases in the context of Rule 60(b) motions. *See Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 780 (9th Cir. 2003). However, even if the court were to assume that Armstrong was permitted to bring such a claim in a § 2255 motion, he is not entitled to relief.

The Ninth Circuit narrowly construes "the term fraud on the court." *Id.* It "embrace[s] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudicating cases that are presented for adjudication." *Id.* Indeed, the Ninth Circuit has so narrowly defined "fraud on the court" that it does not encompass "[n]ondisclosure, or perjury by a party or witness . . . by itself[.]" *Id.* Instead, "[f]raud on the court requires a 'grave miscarriage of justice,' ... and a fraud that is aimed at the court." *Id.* (quoting *United States v. Beggerly*, 524 U.S. 38, 47 (1998)). Armstrong's new evidence does not demonstrate that either FBI Agent Hatcher or AUSA

Smetana made statements that constituted fraud on the court.  Both Hatcher and Smetana stated that they believed the Dallas and San Francisco investigations were unrelated. Exhibit K does not demonstrate that those beliefs themselves were false.  At best, the exhibit demonstrates there was some sort of communication between the two FBI offices regarding authorization of recordings and that Agent Hatcher was involved.  The exhibit does not specify who was being recorded, who was doing the recording, and/or for which investigation the recording was authorized.  Moreover, given that Armstrong concedes the recordings are not exculpatory and has not claimed that they constitute *Brady* material, any misrepresentations, intentional or negligent, regarding the interplay between the two investigations in the context of a motion to continue the trial did not work "a grave miscarriage of justice."  *Beggerly*, 524 U.S. at 47.

For these reasons, this claim fails.

### 3.       Theory of the Case Jury Instruction

At both the commencement and conclusion of the jury trial, Armstrong requested Judge Legge to instruct the jury in accordance with a "theory of the defense" instruction.

Armstrong argued that his requested instruction was justified by the Ninth Circuit's (subsequently vacated) decision in an appeal from Hamilton Taft's involuntary bankruptcy case.  *See In re Hamilton Taft & Co.*, 53 F.3d 285, 288 (9th Cir. 1995), *vacated by* 68 F.3d 337 (1995).  That decision involved debtor Hamilton Taft's bankruptcy trustee, Fred Wyle's appeal of the bankruptcy court's dismissal of the trustee's preference lawsuit to recover pre-bankruptcy payments made to the IRS on behalf of former Hamilton Taft client, S&S Company ("S&S").[8]  *Id.*

As the Ninth Circuit noted,

 just prior to the filing of [Hamilton Taft's involuntary] bankruptcy petition, S & S was notified that it was going to be audited and requested that [Hamilton] Taft provide proof that S & S's payroll taxes were up to date through the end of January. In truth, [Hamilton] Taft had withheld two payments from the IRS

[8]Bankruptcy Code § 547(b) governs "preferential transfers" and permits bankruptcy trustees to recover transfers of the debtor's property when the transfer occurred within the ninety-day "preference period" prior to the filing of the bankruptcy petition.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1

> that had been due on January 17 and 24. However, in order to conceal this from S & S, [Hamilton] Taft immediately issued checks for the missed payments in the amount of $7,632,269 and sent S & S proof of payment. As a result, when the bankruptcy petition was filed, S & S had only $158,929 in claims against [Hamilton] Taft for unpaid taxes. [Hamilton] Taft's other clients were less fortunate—their unpaid taxes total over $90 million dollars, $50.5 million of which is attributable to taxes that were not paid for January.

2

3

4

5

*Id.* at 287.

6

In the adversary proceeding filed by the Hamilton Taft trustee in the bankruptcy court

7

to recover from S&S the January tax payments made by Hamilton Taft on behalf of S&S to

8

the IRS, S&S disputed the characterization of the funds held by Hamilton Taft. S&S argued

9

that the funds were not property of the debtor's estate, and thus that there was no

10

preferential transfer. The bankruptcy court agreed with S&S and dismissed the preference

11

action, and the district court subsequently affirmed the bankruptcy court's decision. Wyle,

12

the bankruptcy trustee, appealed.

13

The Ninth Circuit reversed, holding that although it was "clear that the funds [S&S]

14

withheld from its employees were impressed in a statutory trust when collected," *id.* at 288,

15

S&S's transfer of the trust-fund taxes to Hamilton Taft, without any prior arrangement that

16

the funds were to be segregated and held in trust, meant that Hamilton Taft did not hold the

17

funds in trust for the taxing entity, in that case, the IRS. *Id.* In support, the court noted that

18

> [u]nder normal principles of trusts, if a trustee transfers trust property to a third party, the third party holds that property free of trust unless the trustee committed a breach of trust in conveying the property. Thus, absent a breach of trust, when a trustee enters into a contract with a third party, any trust funds transferred to that third party in consideration of the contract are transferred free of trust unless the contract provides that the transferred funds shall be held in trust.

19

20

21

22

*Id.* (citing Restatement (Second) of Trusts § 283 (1959); IV Austin W. Scott & William F.

23

Fratcher, The Law of Trusts § 283 (4th ed. 1989)). The Ninth Circuit ultimately held that

24

because Hamilton Taft had commingled and used S&S's funds for its own benefit, the

25

funds constituted property of the debtor's estate, Hamilton Taft, and the payments on

26

S&S's behalf therefore qualified as an avoidable preferential transfer under Bankruptcy

27

Code § 547. *Id.*

28

However, after its May 2, 1995 decision was issued, on October 12, 1995, the Ninth

1   Circuit vacated that decision as moot because the case settled.  68 F.3d 337 (9th Cir.

2   1995).

3          In this criminal case, Armstrong moved the district court prior to trial to give the

4   following instruction based on the Ninth Circuit's vacated decision:

5          With respect to the funds paid to Hamilton Taft by the client companies, with
           the exception of two clients who arranged to have their payments kept in
6          separate accounts, the funds paid to Hamilton Taft became the property of
           Hamilton Taft and could be commingled by Hamilton Taft, treated by Hamilton
7          Taft as its own assets, used to pay Hamilton Taft's operating expenses, and
           invested by Hamilton Taft for its own benefit.  Hamilton Taft did not hold the
8          funds in trust as your employer might hold your withholding taxes.  In other
           words, Hamilton Taft was entitled to the use of the funds until the taxes were
9          due to be paid, pursuant to the terms of the contract.

10  Armstrong argued that he was entitled to the instruction because it was "law of the case."

11  Armstrong acknowledged that the Ninth Circuit's decision had been vacated and that the

12  parties in the criminal case were not the same as those in the civil bankruptcy case, but

13  nevertheless argued that those factors were mere "technicalities."

14         The district court declined to give Armstrong's preliminary instruction to the jury

15  regarding the character of Hamilton Taft funds.  It ruled:

16         I don't think [the Ninth Circuit's] decision holds in any way that [S&S's] funds
           can't be deemed trust funds for some criminal purpose.
17
           The [civil] case dealt only with the bankruptcy preference and an IRS statute.
18         And I don't think it touches - perhaps by analogy, but only by analogy - the
           question of the more fundamental relationship between the creditors and
19         Hamilton and Taft and the people who put the money in, if you don't want to
           call them creditors, and what the obligations are.  I don't think that [the
20         bankruptcy] case determines it.

21  The district court then held that the evidence introduced at trial would reveal the nature of

22  the pertinent relationships.

23         At the close of evidence, the district court again declined to give Armstrong's

24  proffered jury instruction, instead giving an instruction that "good faith" constituted a

25  complete defense to the charges.  The court instructed the jury as follows:

26         The good faith of a defendant is a complete defense to the charges in the
           indictment, because good faith on the part of a defendant is inconsistent with
27         the intent to defraud and with the intent to obtain money by false pretenses.

28         A person who acts, or causes another person to act, on a belief or opinion

United States District Court

For the Northern District of California

1    honestly held is not punishable merely because the belief or opinion turns out
2    to be inaccurate, incorrect or wrong.  An honest mistake in judgment or an
     error in management does not rise to the level of intent to defraud.

3    However, a defendant does not act in 'good faith' if, even though he honestly
     holds a certain opinion or belief, that defendant also knowingly makes false or
4    fraudulent pretenses, representation or promises to others.

5    While the term 'good faith' has no precise definition, it means, among other
     things, a belief or an opinion honestly held, an absence of malice or ill will and
6    an intention to avoid taking fraudulent advantage of another.

7    In determining whether or not the government has proved that a defendant
     acted with an intent to defraud, or an intent to obtain money by false
8    pretenses, or whether the defendant acted in good faith, you must consider all
     of the evidence in the case that bears upon that defendant's state of mind.

9
     The burden of proving good faith does not rest on the defendants, because
10   defendants do not have an obligation to prove anything.  It is the
     government's burden to prove to you, beyond a reasonable doubt, that
11   defendant Armstrong and/or defendant Fowles acted with the intent to
     defraud or the intent to obtain money by false pretenses.
12
R.T. 5539-5540.
13
         As noted, Armstrong subsequently challenged the district court's failure to give the
14
above instruction on direct appeal before the Ninth Circuit.  The Ninth Circuit affirmed, and
15
held as follows with respect to the claim:
16
         Armstrong first argues that the district court erred by not providing his
17       proposed theory-of-the-defense instruction. Specifically, he argues that the
         court should have instructed the jury that as a matter of law, he was free to
18       invest Hamilton Taft's client funds in any manner, for any period of time, so
         long as the clients' taxes were paid eventually. The district court refused that
19       instruction but gave a standard "good faith" defense instruction, which
         essentially provided that good faith on the part of the defendant was a
20       complete defense to the charges against him.

21       We disagree with Armstrong's contention that the district court's denial
         of his instruction constituted an abuse of discretion. *See United States v.*
22       *Sarno*, 73 F.3d 1470, 1485 (9th Cir.1995). Although a defendant is entitled to
         a jury instruction explaining his defense theory (provided, of course, that the
23       instruction is grounded in law and the evidentiary record), "it is not reversible
         error to reject a defendant's proposed instruction on his theory of the case if
24       other instructions, in their entirety, adequately cover that defense theory."
         *United States v. Dees*, 34 F.3d 838, 842 (9th Cir.1994). Here, the district
25       court's six paragraph good faith instruction adequately encompassed the
         theory of Armstrong's defense. Armstrong's primary defense throughout the
26       trial was that he lacked the requisite intent to commit fraud because he
         believed that he could freely invest the client funds - in other words, that he
27       acted in good faith. The instruction given by the district court sufficiently

28

30

1    covered the point.[9]

2    *United States v. Armstrong*, 2000 WL 425007 at *1 (9th Cir. 2000).

3                    **a.    Succinct Statement of Claim**

4        In his opening brief, Armstrong now appears to suggest that his claim in the instant §

5    2255 motion is distinct from that which he raised on direct appeal before the Ninth Circuit.

6    Specifically, Armstrong contends that while he

7        maintains his belief that the trial court abused its discretion in denying the law
         of the case instruction, the complaint here is that *the government's failure to*
8        *disclose its material participation in a collateral proceeding deprived*
         *Armstrong of his ability to use a much more powerful defensive tool - the*
9        *collateral estoppel bar to preclude the government's ability to argue a legal*
         *theory in his criminal trial that was completely opposite [of] the court's holding*
10       *in the earlier, collateral proceeding.*

11   Armstrong's August 19, 2011 Opening Brief at 18.

12                   **b.    Procedural Bar**

13       Armstrong then concedes that "[w]hile the law-of-the-case point was presented to,

14   and rejected by the Ninth Circuit," that his current claim, as stated, was not known to him

15   until he received the FOIA documents and was never presented to the Ninth Circuit.

16   Accordingly, Armstrong argues that in terms of any procedural bar, because he is not

17   raising a claim that was raised before the Ninth Circuit, he is *not* required to demonstrate

18   exceptional circumstances.  Instead, Armstrong contends that the procedural bar inquiry

19   should be the same as it is with respect to the preceding two claims that were not

20   previously raised on direct appeal: whether he can demonstrate sufficient cause and

21   prejudice allowing this court to reach them in spite of his procedural default.  *See Bousley*,

22   _____

23       [9]The court further noted:

24       We reject Armstrong's assertion that this Court's decision in *In re Hamilton Taft*
         *& Co.*, 53 F.3d 285 (9th Cir.1995), *opinion vacated,* 68 F.3d 337 (9th Cir.1995),
25       required the district court to use his proposed instruction. *In re Hamilton Taft* has
         been vacated as moot, and thus is no longer binding precedent. Furthermore,
26       its holding - that Hamilton Taft does not hold client funds in trust for the IRS - is
         inapplicable to the issue of what obligations existed between the company and
27       its clients.

28   *United States v. Armstrong*, 2000 WL 425007 at *1 n.2 (9th Cir. 2000).

                                    31

**United States District Court**

For the Northern District of California

1 | 523 U.S. at 621.

2 |        **c.**    **Merits/Analysis**

3 |       Armstrong appears now to argue that the FOIA documents that the government

4 | failed to disclose previously confirm that it "participated" in the Hamilton Taft bankruptcy

5 | case.  Thus, for collateral estoppel purposes, Armstrong contends the government should

6 | be deemed "a party" to the bankruptcy appeal before the Ninth Circuit in *In re Hamilton*

7 | *Taft*.  Because it was a party to the bankruptcy appeal, Armstrong argues that the

8 | government was collaterally estopped by that decision from arguing that Hamilton Taft held

9 | the payroll funds in trust for its clients or the appropriate governmental taxing entities.

10 |       By advancing this argument, Armstrong continues to ignore the fact that the Ninth

11 | Circuit has already held on direct appeal in this very criminal case that its vacated decision

12 | in the bankruptcy appeal is no longer binding, and also that the decision is inapplicable to

13 | the issues in this criminal case.  Thus, even assuming the truth of Armstrong's current

14 | assertions - that there is an overlap in the "parties" in the criminal and civil cases, a fact that

15 | the government did not disclose previously - the Ninth Circuit has already spoken regarding

16 | *In re Hamilton Taft's* impact on the criminal case, and has held that it does not apply.  For

17 | this reason, this claim is utterly without merit, and the court need not decide which

18 | procedural bar to apply.

19 | **CONCLUSION**

20 |       For the reasons set forth above, Armstrong's motion to vacate his sentence, located

21 | at docket no. 549 of CR 94-0267 PJH, is DENIED.   Additionally, this order fully adjudicates

22 | the motion listed on the clerk's docket for C 09-2243 PJH, and terminates all other pending

23 | motions.  The clerk shall close the file.

24 | **CERTIFICATE OF APPEALABILITY**

25 |       To obtain a COA, Armstrong must make "a substantial showing of the denial of a

26 | constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the

27 | constitutional claims on the merits, the showing required to satisfy § 2253(c) is

28 | straightforward.  "The petitioner must demonstrate that reasonable jurists would find the

district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that none of the issues presented by Armstrong in his petition meet the above standard and accordingly DENIES a COA.

**IT IS SO ORDERED.**

Dated: March 5, 2012

_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court

For the Northern District of California

33